**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,   Crim. No. 11-13 (DSD/JJK)

    Plaintiff,

v.   **REPORT AND RECOMMENDATION**

Michael Edward Willis,

    Defendant.

Kimberly M. Hare, Esq., Assistant United States Attorney, counsel for Plaintiff.

Andrea K. George, Esq., Assistant Federal Defender, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

    This matter is before the Court on Defendant Michael Edward Willis' Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14) and Motion to Suppress Eyewitness Identifications (Doc. No. 23). This Court held a hearing on the motions on February 15, 2011, and received four exhibits from the Government, including two search warrant applications, a transcript of an investigative interview with a victim eyewitness, and a sequential line-up photo identification report. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendant's motions be denied.

## BACKGROUND

On January 11, 2011, Defendant was charged with being an armed career criminal in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).  (Doc. No. 1.)

## DISCUSSION

**I.     Motion to Suppress Evidence Obtained from Search and Seizure**

Defendant Willis filed a Motion to Suppress Evidence Obtained as a Result of Search and Seizure.  (Doc. No. 14.)  Defendant's counsel asked this Court to conduct a "four corners" review of the search warrants, but identified no particular deficiency of the supporting affidavits in establishing the probable cause required to issue either warrant.  Neither the Defendant nor the Government requested post-hearing briefing on the issue.  Exhibits were received and admitted into evidence.

**A.     Probable Cause**

This Court concludes that the search warrants for the Defendant's vehicle and DNA sample were based on probable cause, as set forth in the warrant applications and the underlying affidavits.  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Illinois* v. *Gates*, 462 U.S. 213, 236 (1983)).  When determining whether probable cause exists, a court does not independently evaluate each piece of information,

but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004). "In determining whether probable cause exists, [the courts] recognize that the police possess specialized law enforcement experience and thus may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous." *United States v. Mendoza,* 421 F.3d 663, 667 (8th Cir. 2005). Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238-39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

### B.   Search Warrant for the Vehicle

The affidavit of Lieutenant ("Lt.") Fossum, dated October 19, 2010, describes his basis for believing that the Ford Explorer was involved in a robbery and contained evidence of a crime.   (Gov't. Ex. 6.)

The affidavit describes two robberies that occurred on October 19, 2010. The first took place around 3:00 a.m. at XXXX Humboldt Avenue South in Minneapolis.  (*Id.*)  The victim was in her car in the apartment building parking lot. A man approached her as she sat in her car, produced a handgun that was silver in color, and ordered her to give him her purse, and her iPhone.  (*Id.*)  She complied.  (*Id.*)  The victim's purse contained her driver's license and passport, various credit cards, and a make-up bag.  (*Id.*)  The victim later described the suspect as a black male, who was wearing a dark colored New York Yankees baseball cap.  (*Id.*)

Approximately two hours later, another armed robbery was reported at a White Castle restaurant at Central Ave N.E., Minneapolis.  (*Id.*)  The victim, a 69-year-old male, had just purchased a cup of coffee at the drive thru window, and parked in the restaurant lot preparing to drink his coffee in the car.  (*Id.*)  White Castle's video footage showed a tan Ford Explorer SUV, occupied by two black males, passing through the drive-thru window of that White Castle around 5:30 a.m. that day.  (*Id.*)  Ultimately, the Ford Explorer parked next to the victim's car in the White Castle lot.  (*Id.*)  Then, one of the men left the Ford Explorer and approached the victim's driver's side of the vehicle.  (*Id.*)  This man was later

described as wearing a black New York Yankees baseball hat. (*Id.*) The suspect first asked for directions, and then produced a large, silver, revolver-style firearm, demanded the victim's property and threatened to shoot the victim if he did not comply. (*Id.*) The 69 year-old man removed his wallet and a set of keys from his pockets and handed them to the suspect. (*Id.*) The suspect reached into the vehicle and removed the ignition keys. He then ordered the suspect to lie down on the floor as he fled the scene in the tan Explorer. (*Id.*)

The 911 call was placed at 5:39 a.m. (*Id.*) The officers arrived and aired the vehicle description, direction of travel, and suspect description. (*Id.*) They spotted a tan Ford Explorer along the route of travel of the suspect's vehicle travelling southbound on Washington St. NE. from Lowry Ave. NE. (*Id.*) The Ford Explorer was occupied by two black males. (*Id.*) The officers stopped the vehicle and saw, in plain view, an empty holster, a dark New York Yankees baseball hat, and a woman's makeup bag. (*Id.*) At 5:41 a.m., officers found a loaded silver revolver (a .44 caliber Ruger) lying on the same street nearby. (*Id.*) Although the 69-year-old man was unable to identify the suspects in a photo "showup," he stated that he thought the tan Explorer was the suspect's vehicle involved in the robbery. (*Id.*) While at White Castle, the officers were approached by employees who told them they found a white Apple iPhone, and credit cards bearing the name of the female victim of the earlier robbery. (*Id.*)

Based on these facts, and the experience and training of Lt. Fossum, there was probable cause to believe that the Ford Explorer was used as the means of

5

committing a crime and would contain evidence of criminal activity. Accordingly, this Court concludes that the search warrant here was issued upon a cogent showing of probable cause.

### C. Search Warrant for Defendant's DNA

On October 21, 2010, Sergeant ("Sgt.") Carpenter requested a search warrant to obtain DNA evidence from a buccal swab and/or a blood sample from Defendant. (Gov't. Ex. 5.) His accompanying affidavit details the basis for his belief that the samples would tend to show that Defendant committed a crime.

Much of Sgt. Carpenter's affidavit mirrors the facts set forth in the affidavit underlying the October 19, 2010 warrant to search the Ford Explorer. For example, Sgt. Carpenter describes the facts relating to the first robbery on October 19, 2010. (*Id.*) Specifically, the affidavit states that the victim reported that a black male with a large, "silver" handgun had taken her purse, its contents, and a cellphone. (*Id.*) She provided a detailed description of the suspect, mentioned a dark baseball hat, and said that he also wore a yellow polo shirt bearing a large "R" logo. (*Id.*)

Later that morning, White Castle employees found credit cards lying in the restaurant's drive-thru lane. (*Id.*) The employees also found a white Apple iPhone in the parking lot in which the subsequent armed robbery occurred. (*Id.*) The credit cards bore the name of the victim and the iPhone also belonged to her. (*Id.*) After the police officers obtained a search warrant to search the Ford

Explorer, they searched the vehicle and found a yellow polo shirt with a large "R" logo, along with other property. (*Id.*)

On October 20, 2010, the female victim of the 3:00 a.m. robbery met with investigators to discuss the case. (*Id.*) She made a formal statement and identified Defendant in one of two separate sequential photo lineups. (*Id.*) She also identified the recovered iPhone and credit cards as her property and said that the yellow polo shirt was the same shirt worn by the suspect during the robbery. (*Id.*) Finally, she identified the handgun and stated that it was the same type and style as the gun carried by the suspect. (*Id.*)

The Government sought this search warrant to compare Defendant's DNA with potential samples from the yellow polo shirt, the New York Yankees cap, and the handgun. (*Id.*)

Based on these facts, and the experience and training of Sgt. Carpenter, there was probable cause to believe that samples of Defendant's DNA would furnish evidence of a crime. Accordingly, this Court concludes that, as with the October 19, 2010 search warrant, the warrant for Defendant's DNA sample was based on sufficient probable cause.

### D.   *Leon* Good-faith Exception

Even if probable cause did not exist, there was a facially valid warrant in each instance, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a

search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Here, this Court concludes that even if probable cause did not exist, the good-faith exception would apply. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officer's reliance was not reasonable. Thus, the *Leon* good-faith exception provides an alternative basis for the conclusion that the evidence seized as a result of the execution of the search warrant need not be suppressed. Therefore, this Court recommends that Defendant's motion to suppress evidence be denied.

## II.     Motion to Suppress Eyewitness Identifications

Defendant Willis also brought a motion to suppress eyewitness identification. At the hearing, Defendant's counsel asked this Court to review the

admissibility of one eyewitness identification on the grounds that it was overly suggestive, but did not allege or identify any specific deficiency in that photo line-up identification.

The courts in this Circuit use a two-step analysis to evaluate a photographic display. *U.S. v. Gipson,* 383 F.3d 689, 698 (8th Cir. 2004); *U.S. v. Johnson*, 56 F.3d 947, 953 (8th Cir. 1995). The first step is to determine whether the photo spread was impermissibly suggestive. *Johnson*, 56 F.3d at 953. A defendant bears the burden to show that the identification is "impermissibly suggestive" by establishing "special elements of unfairness." *U.S. v. Pickar*, 616 F.3d 821, 827 (8th Cir. 2010) (quoting *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998)).

Should the court find that the photo spread was impermissibly suggestive, the second step is to determine whether the testimony was nonetheless reliable using the five factors enumerated in *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977): (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the defendant prior to the identification; (4) the witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed between the crime and the confrontation. *Johnson*, 56 F.3d at 954. Thus, the identification evidence will be admissible at trial unless the totality of circumstances demonstrates that the impermissibly suggestive procedures "created a very substantial likelihood of

irreparable misidentification." *Gipson*, 383 F.3d at 698 (citing *Johnson*, 56 F.3d at 953).

### A. Suggestiveness

Here, the photo line-up identification was not impermissibly suggestive. There were six photographs in the photo array. All the photographs were of men of the same race and similar features. (Gov't. Ex. 3.) Three men were dressed in white shirts while the others wore orange shirts. The witness was instructed that "the person in this case may or may not be present in these photographs." (Gov't. Ex. 2.) The witness twice reviewed the photographic line-up. (Gov't Ex. 3.) At no time was there prompting or suggestion from the officer. The witness ultimately identified the man in photograph No. 6 stating that: "This one looks more like it. This is what I remember him looking like." (Gov't. Exs. 2 and 3.) In sum, this Court concludes that the photo line-up here was not impermissibly suggestive.

### B. Reliability

But even if this Court were to find that the photo array was impermissibly suggestive—which it was not—the witness's identification here was nonetheless reliable. *See Johnson*, 56 F.3d at 954. Here, the witness had a good opportunity to view the suspect at the time of the crime. (Gov.'t Ex. 2.) She saw him outside of her apartment building while she waited in her car. (*Id.*) She then watched the suspect approach her car until he stood outside of the driver's side window. (*Id.*) The suspect did not cover his face but spoke with the witness and

took her property.  (*Id.*)  The witness accurately described the suspect in detail from the waist up, noting his height and build, the yellow polo shirt, a dark baseball hat, and the absence of tattoos or scars.  (*Id.* at 6–10).  Further, the witness reviewed the photo line-up twice and identified two possibilities but emphasized with reasonable certainty that the Defendant's photo matched her recollections of the suspect.  (*Id.* at 16–17.)   Finally, the witness identified Defendant as the robber on the morning of October 20, 2010—the day after the robbery took place.  (*Id.* at 1.)  Therefore, her memory was fresh when she identified him in the photo line-up.  Based on these facts, this Court finds that there was not a substantial likelihood of misidentification by the witness, and there was evidence that the identification that was made is sufficiently reliable.  Therefore, this Court recommends that Defendant's motion be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14), be **DENIED**; and

2. Defendant's Motion to Suppress Eyewitness Identifications (Doc. No. 23), be **DENIED.**

Date: March 14, 2011

           *s/Jeffrey J. Keyes*
           JEFFREY J. KEYES
           United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 22, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **seven days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.